**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CAL-MAINE FOODS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.  _4:18-cv-857__** |
| **DELBERT E. BROD, JR.,** | § | |
| **INDIVIDUALLY AND D/B/A** | § | |
| **BROD FARMS** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND
APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIONS**

Cal-Maine Foods, Inc. ("Plaintiff" or "Cal-Maine") files this *Verified Original Complaint and Application for Preliminary and Permanent Injunctions* against Defendant Delbert E. Brod, Jr. ("Defendant" or "Brod") and his operating business entity, Brod Farms (together, "Defendants"), and respectfully shows the Court the following:

**MOTION FOR EXPEDITED DISCOVERY & INJUNCTIVE RELIEF SOUGHT**

Cal-Maine seeks preliminary and permanent injunctions to restrain and prevent irreparable harm caused by Defendants' conduct, which conduct violates enforceable agreements between Cal-Maine and Brod.  Cal-Maine understands that the determination whether to enjoin a party is more reliably made after considering the full scope of evidence offered at a preliminary injunction hearing.  Therefore, Cal-Maine has filed a separate *Motion for Expedited Discovery and Preservation Order* in order to make a determination of the relevant facts in advance of a preliminary injunction hearing.  Cal-Maine believes the most responsible approach, given the stakes for everyone involved, is to forego a temporary restraining order, subject to this Court ordering expedited discovery and setting a quick preliminary injunction hearing.

# I.   INTRODUCTION

1.      Cal-Maine brings this lawsuit against its former employee, Brod, and his current operating company, Brod Farms, to prevent further irreparable harm and damage to Cal-Maine's business and prospects.

2.      Cal-Maine paid a significant sum of money to acquire substantially all of the commercial egg production and related distribution assets of Brod's prior business, Happy Hen Egg Farms, Inc. and Happy Hen Foods, L.L.C. (together, "Happy Hen") just last year, in March of 2017.  In connection with such transaction, and in order to protect the value of its investment, Cal-Maine entered into several agreements with Brod and/or Happy Hen on March 3, 2017, including: (1) an Agreement for Sale and Purchase of Assets ("Purchase Agreement"), through which it procured not only the business and associated goodwill, but other customary agreements from Brod and Happy Hen;[1] (2) Noncompetition Agreements, with both Brod and Happy Hen;[2] (3) an Employee Protective Covenants Agreement ("Employee Agreement"), made in connection with Brod becoming an employee of Cal-Maine;[3] and (4) a Compensation and Other Benefits letter agreement ("Compensation Agreement"), setting forth compensation and benefits for Brod as an employee at Cal-Maine.[4]  Together, the aforementioned agreements are referred to herein as the "Brod Agreements."

---

[1] *See* Exh. A-1 hereto.  Also in conjunction with the Purchase Agreement, the parties signed a Closing Agreement (Exh. A-2) and Seller's Closing Certificate (Exh. A-3), the latter providing certification by the seller that all representations and warranties of the seller as set forth in the Purchase Agreement are true and correct, and that all seller obligations have been performed.  *See* Exh. A-3.

  Because Cal-Maine's acquisition agreement is confidential and competitively sensitive, it submits the Purchase Agreement attached hereto in redacted form.  If necessary, Cal-Maine will provide the agreement to the Court for *in camera* review.

[2] *See* Exhs. B & C hereto.

[3] *See* Exh. D hereto.

[4] *See* Exh. E hereto.

3.     The Brod Agreements included, among other things, certain restrictions on Brod relevant to this action:  (a) to refrain from competing against Cal-Maine;[5] (b) to refrain from soliciting Cal-Maine's customers and employees;[6] and (c) to refrain from improperly using or disclosing Cal-Maine's confidential information.[7]   After it was discovered that Brod had violated these restrictive agreements, as shown below, Brod was terminated from his employment with Cal-Maine on February 16, 2018.  It now appears that Brod defrauded Cal-Maine by hatching a plan – pre-dating the sale of his Happy Hen business – to compete directly against Cal-Maine immediately upon closing of the transaction.  He is doing so individually and/or through an entity called Brod Farms.

4.     Indeed, the very day of closing of the Purchase Agreement on March 3, 2017, and after receipt by Brod and Happy Hen (or payments to Brod's and/or Happy Hen's creditors) of more than $17.2 million from Cal-Maine, Brod signed a permit application to be filed with the Texas Commission on Environmental Quality ("TCEQ") to obtain a permit to operate a competing commercial egg business ("TCEQ Permit Application").  Ten days later, on March 13, 2017, the TCEQ Permit Application was filed.  This conduct not only breached the aforementioned agreements, it also demonstrates fraud and fraud in the inducement, as Brod clearly planned to compete with Cal-Maine even before closing of the Purchase Agreement.

5.     Cal-Maine has learned that Brod is continuing to take proactive steps to directly compete with Cal-Maine and may be soliciting Cal-Maine's customers and employees, all in violation of the Brod Agreements.  Indeed, Brod sabotaged Cal-Maine's customer base that

---

[5] *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶ 4), and Employee Agreement (Ex. D at ¶ 5).

[6] *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶ 4), and Employee Agreement (Ex. D at ¶ 5).

[7] *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶¶ 1, 3), and Employee Agreement (Ex. D at ¶ 4).

originated from the Brod acquisition and lost a majority of the customers and business. Additionally, Cal-Maine is greatly concerned that Brod has misappropriated Cal-Maine's confidential, proprietary, and trade secret information, including intellectual property that Cal-Maine owned before the transaction and purchased from Brod pursuant to the Purchase Agreement to plan and carry out his competing business.

6.      Injunctive relief is necessary to prevent Brod and his company from continuing to cause Cal-Maine to suffer irreparable harm through on-going solicitation and competition against Cal-Maine and continued use and disclosure of confidential, proprietary and trade secret information, in violation of multiple agreements.  Further, expedited discovery is appropriate pursuant to Cal-Maine's *Motion for Expedited Discovery and Preservation Order* to preserve and identify relevant evidence in Defendants' possession and control, and to determine the full extent of the complained of conduct.

## II.      THE PARTIES

7.      Plaintiff Cal-Maine Foods, Inc. is a corporation organized and incorporated under the laws of the State of Delaware, with its principal place of business in Jackson, Mississippi.

8.      Defendant Delbert E. Brod, Jr. is an individual believed to be residing in Fort Bend County, Texas.  He may be served at his residence located at 16 Swan Isle Boulevard, Missouri City, Texas  77459, or wherever he may be found.

9.      Defendant Brod Farms is, on information and belief, a d/b/a of Defendant Delbert E. Brod, Jr., and may thus be served by and through Brod at his residence located at 16 Swan Isle Boulevard, Missouri City, Texas  77459, or wherever he may be found.

## III.      JURISDICTION AND VENUE

10.      This Court has jurisdiction over this lawsuit pursuant to 28 USC § 1332 because Plaintiff and Defendants are citizens of different states and Plaintiff's claims against

Defendants, including attorneys' fees expressly recoverable by contracts with the Defendants, exceed $75,000.00, exclusive of interest and costs.

11.     This Court also has jurisdiction over the lawsuit under 28 U.S.C. § 1331 because one of Cal-Maine's claims arises under federal law:  The Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The Court has supplemental jurisdiction over Plaintiff's other claims in this lawsuit pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this district pursuant to the provisions of 28 U.S.C. §§ 1391(a)(2) and 1391(b), because a substantial part of the events giving rise to these claims occurred in this district, and because Defendants are subject to personal jurisdiction in this district at the commencement of this action.

13.     Venue also is proper in this district pursuant to the forum and venue selection clauses of the Purchase Agreement (Exh. A-1 at ¶ 10.04), Noncompetition Agreements (Exh. B & C at ¶ 10.04), and Employee Agreement (Ex. D at ¶ 11).  *Kevlin Servs. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995).

## IV.     FACTUAL BACKGROUND

### A.     Cal-Maine's Business

14.     Cal-Maine is the largest producer and marketer of shell eggs in the United States. The success of Cal-Maine Foods started with its founder, Fred Adams, whose business interest and ingenuity began at the age of 10 when his father gave him two milk cows and a cotton patch. Fred worked the cotton patch and sold the milk from his cows.  In 1957, Adams took the first step to starting an enterprise that has become the largest supplier of eggs in the United States.   Purchasing a used truck, he delivered feed in rural areas surrounding Mississippi's capitol city, Jackson.  Later that year, Fred started his first chicken farm on leased property, and

in 1958, began his first commercial layer operation in Mendenhall, Mississippi.  In 1963, the enterprise expanded to become the world's largest egg farm in Edwards, Mississippi.

15.     In 1969, Adams Foods, Incorporated merged with Dairy Fresh Products Company of California and Maine Egg Farms of Lewiston, Maine to create Cal-Maine Foods, Inc., supplying eggs from California to Maine.  Since becoming a public company in 1996, Cal-Maine has continued to grow through the acquisition of other egg farms across the country and has maintained its position as the largest producer and distributor of fresh shell eggs in the United States.

16.     Cal-Maine  now  operates  farms,  processing  plants,  hatcheries,  feed  mills, warehouses, offices and other properties located in many states, including Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Mississippi, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas and Utah.

**B.      Brod & Happy Hen**

17.     For many years, Brod operated a commercial egg distribution business under the Happy Hen name near Wharton, Texas in Wharton County.  In approximately 2012, Brod constructed and began operating a state of the art egg production facility for approximately 350,000 laying hens and related distribution facilities near Harwood, Texas in Gonzales County. The production site is designed for capacity of up to 1.2 million laying hens.

18.     As early as 2012, Brod began actively courting Cal-Maine to purchase Happy Hen.  On March 6, 2012, Cal-Maine and Brod, signed a non-disclosure agreement regarding a potential acquisition of Happy Hen by Cal-Maine.  For nearly a year, Brod solicited and Cal-Maine delivered several proposals but no binding agreement was entered into.

19.     On July 13, 2015, Cal-Maine and Brod signed the first of several letters of interest ("LOI") (dated July 10, 2015) for Cal-Maine to acquire certain assets from Happy Hen related

to its commercial egg facilities and egg distribution business. Brod backed out of the first transaction. On July 22, 2016, however, Cal-Maine and Brod signed a second LOI (dated July 20, 2016), but again Brod backed out of the transaction. Finally, on December 8, 2016, after a significant downturn in the market and Brod experiencing certain business and operational difficulties (including environmental problems that required significant assistance from Cal-Maine to rectify prior to the closing), a third and final LOI was signed. On February 8, 2017, the parties signed the Purchase Agreement that would ultimately close on March 3, 2017.

20.     Unbeknownst to Cal-Maine, a year earlier in May of 2016, Brod had engaged an environmental consulting firm to draft the TCEQ Permit Application for operation of a significant 5,000,000 laying hen poultry operation in Gonzales County, Texas on property owned by Brod that Cal-Maine did not acquire as part of the Purchase Agreement. This operation would be the largest egg laying facility in the whole Southern United States, on a relatively small piece of land in a highly developed area. As such, upon learning of the project in due diligence, Cal-Maine informed Brod that it was not feasible and Cal-Maine would not develop the project and would not allow Brod to pursue it because it would be in direct competition with Cal-Maine. In the negotiations leading up to Cal-Maine's purchase of Brod and Happy Hen's assets, Brod assured Cal-Maine he would not construct an egg facility on that property. Instead, he represented to Cal-Maine that he would keep the property and someday develop a truck stop or travel center.

21.     Cal-Maine would not have entered into the Purchase Agreement and closed the transactions contemplated thereby but for Brod's execution of the Noncompetition Agreements and the Employee Agreement committing to not engage in competitive activities with Cal-Maine and the business it was purchasing from Brod and Happy Hen.

22.    In February of 2017, however, after signing the Purchase Agreement, Brod instructed the consulting firm to change the name on the TCEQ Permit Application from "Happy Hen #2" to Delbert E. Brod Jr., individually.   The purpose of this name change is obvious – to hide Brod's intent and actions to violate multiple agreements with Cal-Maine.

23.    On March 3, 2017, the Purchase Agreement transaction closed and more than $17.2 million was transferred from Cal-Maine to or for the benefit of Brod and Happy Hen.[8] That same day, Brod signed the TCEQ Permit Application and informed the consulting firm to proceed – but he wanted to keep it quiet.   On March 13, 2017, the TCEQ Permit Application was filed with the TCEQ by the consulting firm.[9]

24.    After becoming a Sales Manager for Cal-Maine, employment issues began to arise with Brod.   Specifically, Brod began acting contrary to his duties to Cal-Maine by ignoring or delaying customer orders, alienating customers instead of managing and developing their business, clearly disrupting Cal-Maine's business as well as work being done by other Cal-Maine employees, not coming to the office, and generally not working on behalf of the company.   Given his exposed plan to compete with Cal-Maine, Brod's lack of interest in fulfilling his job obligations for Cal-Maine is not surprising.

25.    In February of 2018, Cal-Maine discovered that Brod had filed the TCEQ Permit Application – it was published in the local paper for public comment.   Upon learning of this blatant violation of multiple covenants and duties set forth in the Brod Agreements, on February 16, 2018, Brod was terminated from his employment with Cal-Maine.

26.    The TCEQ Permit Application is now the subject of public comment before issuance of a permit.   Once issued, the permit would allow Brod to develop and operate a

---

[8]  *See* Exh. A-1 - A-3 & B-E.

[9]  *See* Exh. F.

competing business, sell the competing business, or partner with a competitor to Cal-Maine, all contrary to his express obligations.

## C.   Relevant Provisions of Brod Agreements

27.     The Purchase Agreement incorporated two attached exhibits that constituted agreements between the parties related to noncompetition, nonsolicitation, and confidentiality in favor of Cal-Maine.[10]   These agreements were executed by Brod and Cal-Maine at the closing of the transactions contemplated by the Purchase Agreement.   Additionally, the parties signed the Employee Agreement at the closing, which likewise contained provisions prohibiting competition, solicitation, and disclosure of confidential information.[11]

28.     Specifically, the Noncompetition Agreements prohibited Brod from competing with Cal-Maine for a period of ten (10) years on a national basis, given the scope of Cal-Maine's business operations.[12] All of the agreements further restricted Brod from soliciting employees or customers for the same time period of ten (10) years (or, for an employee that has left Cal-Maine, for one (1) year after such departure).[13]   Finally, all of the agreements prohibited Brod from disclosing Cal-Maine "Confidential Information," as that term is broadly defined in Paragraph 1(b) of the Noncompetition Agreements and Paragraph 1 of the Employee Agreement.[14]

---

[10]   *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02, and Exhs. 2.01 & 2.02 thereto), *see also* Noncompetition Agreements (Exh. B & C).

[11]   *See* Employment Agreement (Exh. D ¶ 1, 4).

[12]   *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶ 4).   The Employee Agreement prohibited competition for a five (5) year period after departure from the company (Ex. D at ¶ 5), but the longer period of the aforementioned agreements controls.

[13]   *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶ 4), and Employee Agreement (Ex. D at ¶ 5).

[14]   *See* Purchase Agreement (Exh. A-1 at ¶¶ 2.01, 2.02), Noncompetition Agreements (Exh. B & C at ¶ 3), and Employee Agreement (Ex. D at ¶ 4).

29.     The Purchase Agreement contained an indemnification provision whereby the seller (which was defined to include Brod) will indemnify, defend, and hold Cal-Maine harmless from any and all loss, liability, claim, etc. (including attorneys' fees and litigation expenses) associated with any breach of "any covenant or agreement" made by seller as part of the transaction.[15]  This agreement also provided a special rule for fraud – that is, any finding of actual fraud entitles the other party to recovery notwithstanding any other limitations set forth in the agreement.[16]

30.     The Noncompetition Agreements contained a provision permitting recovery of damages from seller and injunctive relief for breach or threatened breach of any provisions of Paragraphs 3 and 4 of the agreement, "it being agreed that money damages alone would be inadequate to compensate Cal-Maine and would be an inadequate remedy for such breach."[17]

31.     The Employee Agreement contained a remedies provision to the effect that any breach by Brod of the agreement will entitle Cal-Maine to injunctive and equitable relief to restrain any breach or threatened breach of Paragraphs 4 and 5 of the agreement, "it being agreed that money damages alone would be inadequate to compensate Cal-Maine and would be an inadequate remedy for such breach."[18]

## V.     CAUSES OF ACTION

### A.     Count 1 – Breach of Contract

32.     Cal-Maine purchased the Happy Hen assets from Brod and Happy Hen pursuant to the Purchase Agreement executed between them dated February 8, 2017.  Concurrent with

---

[15] *See* Purchase Agreement (Exh. A-1 at ¶ 9.01).

[16] *See* Purchase Agreement (Exh. A-1 at ¶ 9.07(b)).

[17] *See* Noncompetition Agreements (Exh. B & C at ¶ 6(a) & (c)).

[18] *See* Employee Agreement (Ex. D at ¶7).

the closing of the transaction on March 3, 2017, Brod became an at-will employee of Cal-Maine.

### 1.    *Violation of Representations and Warranties*

33.    Pursuant to the Purchase Agreement, Brod made multiple material representations, warranties, and covenants to Cal-Maine under sections 4.01(d) and 4.01(g). Specifically, Brod represented, warranted, and covenanted that no material and adverse change existed in the prospects, assets, and/or condition of the business he was selling to Cal-Maine. Brod further represented, warranted, and covenanted that he would disclose any facts known to him that may materially adversely affect the assets, business, prospects, financial condition or results of his operations, the business, or the purchased assets.  But at the same time, Brod actively and secretly took steps to develop a competing business that would contain 5,000,000 laying hens, again the largest laying hen operation in the Southern United States.  Brod did not disclose these material and adverse facts to Cal-Maine as Brod was required to do under his Purchase Agreement, and Brod breached the Purchase Agreement.

34.    Brod and Happy Hen's conduct complained of herein constitutes a breach of these representations and warranties, for which Cal-Maine seeks appropriate damages.

### 2.    *Violation of Non-Competition Agreements*

35.    Pursuant to the Noncompetition Agreements and Employee Agreement, Brod agreed not to "directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, or be employed by, consult with, or in any manner connected with, lend [his] name or any similar name to lend [lend [his] credit to, or render services or advice to, any business whose products, services, or

activities compete in whole or in part" with Cal-Maine's business.[19]  The non-compete covenant is national in scope for a period of ten (10) years.

36.    Cal-Maine has enforceable covenants not to compete with Brod, and Defendants are competing with Cal-Maine in violation of those covenants, and it is clear that Brod crafted and implemented his scheme to do so before selling his business to Cal-Maine and, afterwards, while he was employed by Cal-Maine.

37.    Upon information and belief, Brod misappropriated Cal-Maine's customers and has been, and is, competing with Cal-Maine.  Further, Brod is likely intending to use intellectual property purchased by Cal-Maine to compete with Cal-Maine.

38.    Brod's breach of his covenants not to compete has caused, and will continue to cause, Cal-Maine irreparable injury for which there is no adequate remedy at law.  Cal-Maine seeks a preliminary injunction and permanent injunction to address Brod's breach of his covenants not to compete.  Furthermore, Cal-Maine is entitled to recover its reasonable and necessary attorneys' fees incurred in connection with enforcing the contractual non-compete obligations under this agreement (including recovery against Brod pursuant to the express terms of the Employment Agreement).[20]

### 3.    *Violation of Confidentiality Agreements*

39.    The Purchase Agreement, Noncompetition Agreements, and Employee Agreement contained confidentiality provisions that required Brod to maintain the confidence of a great deal of information, including without limitation, "any and all trade secrets with respect to the Business, product specifications, data, agreements, contracts, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples,

---

[19]  *See* Exhs. B & C at ¶ 4; *see also* Exhs. D at ¶ 5 & A-1 at Art. II.
[20]  *See* Exh. A-1 at ¶ 9.01.

inventions and ideas, past, current and planned research and development, current and planned growing, manufacturing and distribution methods and processes, customer lists, sales information, current and anticipated customer requirements, methods, price lists, market studies, business plans, computer software programs . . ., computer software and database technologies, systems, structures and architectures . . . ."[21]   Upon information and belief, Brod has violated this confidentiality provision by disclosure of protected information to third parties to facilitate competition with Cal-Maine.

40.     Pursuant to both the Noncompetition Agreement and his Employee Agreement, Brod agreed not to disclose or make any use of Cal-Maine's Confidential Information. Confidential information was acquired by Cal-Maine as part of the Purchase Agreement, which Brod cannot use or disclose in competition with Cal-Maine.   Additionally, confidential information was disclosed by Cal-Maine to Brod by virtue of his position as Sales Manager at Cal-Maine.  Further, Cal-Maine entrusted Brod with knowledge of business opportunities being developed by Cal-Maine and placed Brod in a position to develop business goodwill belonging to Cal-Maine.

41.     Upon information and belief, Brod has also violated Cal-Maine's trust in him by using Confidential Information for his own ends, among other things, to unfairly compete with Cal-Maine before, during, and after his employment with Cal-Maine.

42.     Cal-Maine seeks money damages to address Brod's breach of his agreement not to use or disclose Confidential Information and breach of the confidentiality provision of the Purchase Agreement and Employee Agreement. Cal-Maine also seeks injunctive relief to require the return of its Confidential Information and to prevent its further use or disclosure by

---

[21]  *See* Exhs. B & C at ¶ 3; *see also* Exhs. D at ¶ 5 & A-1 at Art. II.

Brod.  Furthermore, Cal-Maine is entitled to recover its reasonable and necessary attorneys' fees incurred in connection with enforcing Brod's contractual confidentiality obligations (including recovery against Brod pursuant to the express terms of the Employee Agreement).[22]

4.    *Violation of Non-Solicitation Agreement*

43.    Pursuant to the Noncompetition Agreement and his Employee Agreement, Brod also agreed not to "directly or indirectly, either for himself or any other person, entity or other third party, solicit the business of any person, entity or other third party known to [him] to be a customer or contractor of Cal-Maine or the Business, whether or not [he] had personal contact with such party, with respect to products, services or activities which compete in whole or in part with the Restricted Business."[23]

44.    Upon information and belief, Brod began soliciting customers of Cal-Maine for his competing interests while he was still employed by Cal-Maine.

45.    Cal-Maine seeks money damages to address Brod's breach of his non-solicitation agreements with Cal-Maine.  Cal-Maine also seeks injunctive relief to prevent further solicitations of its customers in direct contravention of the Brod Agreements.

**B.    Count 2 – Computer Fraud and Abuse Act – 18 U.S.C. § 1030**

46.    Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

47.    Cal-Maine's computers are used in interstate commerce.  As such, Cal-Maine's computers are protected computers pursuant to 18 U.S.C. § 1030(c)(2)(B).

48.    On information and belief, Brod – knowingly and with intent to defraud – accessed and used computer resources of Cal-Maine, without authorization or in a manner

---

[22]  *See* Exh. A-1 at ¶ 9.01.

[23]  *See* Exhs. B & C at ¶ 4; *see also* Exhs. D at ¶ 5 & A-1 at Art. II.

exceeding any authorization he may claim he had.  By means of such conduct, Brod furthered the intended fraud.

49.     Specifically, on information and belief, Brod transmitted Cal-Maine Confidential Information to third persons from his own personal e-mail and phone text accounts.  Brod was not authorized to transmit such proprietary and confidential information outside of Cal-Maine and would have had no valid Cal-Maine related business reason for doing so.

## C.     Count 3 – Breach of Fiduciary Duty

50.     Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

51.     Cal-Maine imposed significant trust in Brod during his employment with Cal-Maine.  Indeed, Brod was a Sales Manager with significant responsibilities for the Southeast Texas region; he was entrusted to protect and develop Cal-Maine's business interests and act in the best interest of Cal-Maine at all times.  Brod was, whether formally or informally, a fiduciary to Cal-Maine.  Brod acknowledged and agreed that he owed Cal-Maine a fiduciary duty of loyalty, fidelity and allegiance in his Employee Agreement.[24]  Brod was, therefore, required to deal in the best of good faith with Cal-Maine and to refrain from self-dealing. Brod's duties also included the duties of disclosure and the utmost loyalty.

52.     As described above, Brod engaged in conduct that was directly contrary to Cal-Maine's interests.  Brod has breached his fiduciary duties by the conduct described above.

53.     Cal-Maine requests injunctive relief to prevent Brod from profiting from his breaches of his fiduciary duties and specifically requests that the Court order him, and any company with whom he is working (including Brod Farms), to disgorge any profits made from business Brod acquired from such breaches.

---

[24] *See* Exh. D at ¶ 2.

54.     Further, Brod's actions were committed with legal malice, such that Cal-Maine is entitled to recover, and requests, exemplary damages from Defendants pursuant to Texas Civil Practice & Remedies Code § 41.001 *et seq.*

**D.      Count 4 – Conversion**

55.     Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

56.     On information and belief, Brod, and his operating company Brod Farms, has taken, without permission, information and other property belonging to Cal-Maine for his own use, including without limitation proprietary information, customer information and data, and competitive information essential to Cal-Maine's business.

57.     Defendants have unlawfully, and without authority, assumed dominion and control over Cal-Maine's property in a manner inconsistent with Cal-Maine's rights.

58.     As a direct and proximate result of Defendants' conduct, Cal-Maine has suffered and will continue to suffer damages, and Cal-Maine seeks compensatory damages for Defendants' wrongful conduct.

59.     Defendants' conversion of property, as alleged above, was malicious in that Defendants specifically intended to deprive Cal-Maine of its property.  Accordingly, Cal-Maine requests that exemplary damages be awarded against Defendants.

**E.      Count 5 – Fraud and Fraudulent Inducement**

60.     Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

61.     It is clear to Cal-Maine that Brod intended to compete against Cal-Maine and put plans in motion to do so before the transaction with Cal-Maine closed, therefore breaching not only the warranties, representations, and covenants he made to and with Cal-Maine, but also

committing actual fraud.  For example, Brod had already instructed the consulting firm to put together the permit application for his competing business, and immediately upon closing of the transaction, he instructed the consulting firm to proceed with filing the application.  Brod informed Cal-Maine that he planned to construct a truck stop or travel center on the property, thus affirmatively misleading Cal-Maine.  Brod failed to disclose these actions or his future intentions, and in fact, promised to do the opposite, thus defrauding Cal-Maine.

62.     Brod's demonstrably false representations to Cal-Maine that he was selling his business and agreeing not to compete were material to Cal-Maine.  When Brod made these false representations to Cal-Maine, he knew they were false because he was, at the same time, actively pursuing a permit and plan to open a direct competitor.  The agreements make clear that Brod knew Cal-Maine intended to and did rely on Brod's false representations.

63.     As a direct and proximate cause of Brod's actions, Cal-Maine has suffered and will continue to suffer damages.

64.     Moreover, because Brod's fraudulent conduct set forth above occurred prior to and caused Cal-Maine to enter multiple written agreements with Brod, including without limitation, the Purchase Agreement, Noncompetition Agreements, and Employee Agreement, Defendants are also liable for fraudulent inducement.

65.     Further, Brod's actions constituting fraud and fraudulent inducement were committed with legal malice, such that Cal-Maine is entitled to recover, and requests, exemplary damages from Defendants pursuant to Texas Civil Practice & Remedies Code § 41.001 *et seq.*

## VI.     APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIONS

66.     Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

67.     If Defendants are allowed to compete with Cal-Maine and thus take advantage of Brod's illegal conduct and breaches of fiduciary duty and contract, it will cause further irreparable injury to Cal-Maine for which there is no adequate remedy at law.  Cal-Maine is threatened with the further loss of significant business, the value of which cannot be calculated at this time.

68.     The public interest would be best served by the issuance of the injunctive relief Cal-Maine seeks because the obligations breached by Defendants are destructive to the sound and productive business practices that fuel a healthy economy.

69.     Cal-Maine has demonstrated already that it has a probable right to success on the merits of its case.  Indeed, Brod's breaches of his various obligations while he was still employed with Cal-Maine demonstrate the merits of Cal-Maine's claim.  Moreover, Brod agreed that money damages would not be sufficient and Cal-Maine would be entitled to injunctive relief to enforce the confidentiality and non-compete provisions of the Purchase Agreement.  *See* Exhs. B & C at ¶ 6.

70.     Cal-Maine seeks preliminary and permanent injunctions against Defendants as follows:

     a.     Prohibiting Defendants from using or disclosing any Cal-Maine confidential/trade secret information;

     b.     Requiring that Defendants return any and all Cal-Maine property in their possession, custody, or control;

     c.     Prohibiting Defendants from competing with Cal-Maine for the period required under the Noncompetition Agreement, ten (10) years, and under the Employee Agreement, five (5) years, such periods to run simultaneously;

     d.     Prohibiting Defendants from soliciting Cal-Maine's customers and employees required under the Noncompetition Agreement, ten (10) years, and under the Employee Agreement, five (5) years, such periods to run simultaneously;

e.    Prohibiting Defendants from ever competing with Cal-Maine in any respect by using Cal-Maine's confidential and trade secret information;

f.    Prohibiting Defendants from further violations of Paragraphs 4 ("Non-Competition") and 3 ("Confidentiality") of the Noncompetition Agreements; and

g.    Requiring Defendants to identify any information in their possession, custody, or control that belongs to Cal-Maine, including without limitation any electronic information downloaded from Cal-Maine servers or computers and information received by email or text message.

## VII.    EXEMPLARY DAMAGES

71.    Cal-Maine, without waiving the foregoing, realleges and incorporates the allegations set forth above.

72.    Due to Defendants' wrongful conduct, Cal-Maine is entitled to recover exemplary damages pursuant to, inter alia, Section 41.003 of the Texas Civil Practice & Remedies Code.

## VIII.   JURY DEMAND

73.    Cal-Maine demands a trial by jury for all triable issues of fact.

## IX.    PRAYER

74.    WHEREFORE, Plaintiff Cal-Maine Foods, Inc. requests that Defendant Delbert E. Brod, Jr., d/b/a Brod Farms be cited to appear and answer, and respectfully request that this Court award:

a.    Injunctive relief against both Defendants as requested above, first in the manner of a preliminary injunction, and finally as a permanent injunction;

b.    Judgment against Brod for breach of contract;

c.    Judgment against Brod for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

d.    Judgment against Brod for breach of fiduciary duty;

e.    Judgment against Brod for conversion;

f.    All actual and statutory damages owed to Cal-Maine for harm caused by Brod's actions;

g.    Punitive damages owed to Cal-Maine as a result of Brod's fraudulent and malicious actions;

h.    Costs and attorneys' fees;

i.     Prejudgment and post-judgment interest as provided by law; and

j.     Such other and further relief to which Plaintiff may be justly entitled.


Dated:  March 19, 2018                              Respectfully submitted,

                                                    JACKSON WALKER LLP


                                                    By:  /s/ John K. Edwards_____
                                                         John K. Edwards
                                                         Attorney-In-Charge
                                                         Texas Bar No. 24002040
                                                         S.D. I.D. No. 21645
                                                         1401 McKinney, Suite 1900
                                                         Houston, Texas 77010
                                                         Telephone:  (713) 752-4200
                                                         Facsimile: (713) 752-4221
                                                         E-mail:  jedwards@jw.com

                                                         ATTORNEYS FOR PLAINTIFF

OF COUNSEL:

    Joel R. Glover
    State Bar No. 24087593
    S.D. I.D. No. 2221289
    JACKSON WALKER LLP
    1401 McKinney, Suite 1900
    Houston, Texas 77010
    Telephone:  (713) 752-4200
    Facsimile:  (713) 752-4221
    E-mail:  jglover@jw.com

## VERIFICATION

STATE OF MISSISSIPPI      §
                          §
COUNTY OF HINDS           §

    BEFORE ME, the undersigned authority, on this day personally appeared Sherman Miller, Vice President and Chief Operating Officer of Cal-Maine Foods, Inc., who by me being duly sworn as a corporate representative of Cal-Maine Foods, Inc., with authority to execute this Verification on behalf of same, testified that he has read the foregoing *Plaintiff's Verified Original Complaint and Application for Preliminary and Permanent Injunctions*, and that all the factual matters stated therein are within his personal knowledge in his capacity as a corporate representative and are true and correct.

By: _____

       Sherman Miller

    **SWORN TO AND SUBSCRIBED BEFORE ME**, the undersigned authority, this 19th day of March 2018.

Notary Public in and for the
State of Mississippi

*Mary J. Kimbrough*

Printed Name of Notary Public

Mary J. Kimbrough

My Commission Expires: 1/4/2020